## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MELVYN KLEIN, Derivatively on Behalf of CONAGRA BRANDS, INC., | Case No.: |
| Plaintiff, | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ANIL ARORA, THOMAS K. BROWN, STEPHEN G. BUTLER, SEAN M. CONNOLLY, JOIE A. GREGOR, RAJIVE JOHRI, RICHARD H. LENNY, RUTH ANN MARSHALL, AND CRAIG P. OMTVEDT, | |
| Defendants, | |
| and, | |
| CONAGRA BRANDS, INC., | |
| Nominal Defendant. | |

Plaintiff Melvyn Klein ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Conagra Brands, Inc. ("Conagra" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Conagra against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties that occurred from June 27, 2018 through the present (the "Relevant Period") and have caused substantial harm to Conagra.

## THE PARTIES

**Plaintiff**

2.      *Plaintiff Melvyn Klein* is, and was at relevant times, a shareholder of Conagra. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

3.      Nominal Defendant Conagra Brands, Inc. ("Conagra') is incorporated in Delaware, and the Company's principal executive offices are located in Chicago, Illinois.

**Director Defendants**

4.      *Defendant Anil Arora* ("Arora") has served as a director of the Company since July 17, 2018.  Defendant Arora is a member of the Audit and Finance Committee.

5.      *Defendant Thomas K. Brown* ("Brown") has served as a director of the Company since October 15, 2013.  Defendant Brown is a member of the Audit and Finance Committee.

6.       *Defendant Stephen G. Butler* ("Butler") has served as a director of the Company since May 16, 2003.  Defendant Butler is the Chairman of the Audit and Finance Committee. Defendant Butler is also a member of the Executive Committee.

7.        *Defendant Sean M. Connolly* ("Connolly") has served as the Company's President and Chief Executive Officer and a member of the Board since April 6, 2015. Defendant Connolly is a member of the Executive Committee.

8.        *Defendant Joie A. Gregor* ("Gregor") has served as a director of the Company since February 6, 2009. Defendant Gregor is a member of the Audit and Finance Committee, the Executive Committee, and Chairman of the Nominating, Governance and Public Affairs Committee.

9.        *Defendant Rajive Johri* ("Johri") has served as a director of the Company since January 1, 2009. Defendant Johri is a member of the Human Resources Committee and the Nominating, Governance and Public Affairs Committee.

10.       *Defendant Richard H. Lenny* ("Lenny") has served as a director of the Company since March 17, 2009 and Non-Executive Chairman since May 28, 2018. Defendant Lenny is a member of the Executive Committee Human Resources Committee and Nominating, Governance and Public Affairs Committee.

11.       *Defendant Ruth Ann Marshall* ("Marshall") has served as a director of the Company since May 23, 2007. Defendant Marshall is a member of the Executive Committee, the Chairman of the Human Resources Committee and a member of the Nominating, Governance and Public Affairs Committee.

12.       *Defendant Craig P. Omtvedt* ("Omtvedt") has served as a director of the Company since November 11, 2016. Defendant Omtvedt is a member of Audit and Finance Committee.

13.       Defendants Arora, Brown, Butler, Connolly, Gregor, Johri, Lenny, Marshall and Omtvedt shall be collectively referred to as the "Director Defendants."

14.       Defendants Arora, Brown, Butler, Gregor and Omtvedt shall be collectively referred to as the "Audit Committee Defendants."

3

## AUDIT COMMITTEE

15.     The Audit and Finance Committee is appointed by the Board to assist the Board in fulfilling its oversight responsibilities by reviewing (i) the integrity of the financial statements of the Company, (ii) the qualifications, independence and performance of the Company's independent auditors and internal auditing department, (iii) the compliance by the Company with legal and regulatory requirements, and (iv) the Company's perspectives on financing strategies and capital structure, in light of its strategic long range plans.

16.     The Audit and Finance Committee's function is one of oversight.  The Audit and Finance Committee is responsible for the following:

### Internal Audit Oversight

The Committee shall provide oversight of the Company's internal audit function, including reviewing the organization structure, budget, Internal Audit Charter, annual audit plan and all major changes to the plan, results of the internal audit activities, and adequacy of the Company's internal controls.

The Committee shall review the effectiveness of the internal audit function, including conformance with The Institute of Internal Auditors' Definition of Internal Auditing, Code of Ethics and the International Standards for Professional Practice of Internal Auditing.

At least once per year, review the performance of the Chief Audit Executive and concur with the annual compensation and salary adjustment of such Chief Audit Executive.

The Committee shall review the appointment and replacement of the Chief Audit Executive, and review significant issues identified by the internal auditing department.

### Financing Strategy Actions

The Committee shall annually review the Company's financial condition (including matters such as liquidity, debt levels, credit ratings and interest rate risk exposure), capital structure (including sources and uses of capital), and long-term financing strategy.

The Committee shall annually review the Company's dividend policy and recommend dividend actions to the Board of Directors.

The Committee shall annually review the Company's plans for share repurchase prior to consideration by the full board.

The Committee shall annually review the Company's capital expenditure budget prior to consideration by the full board.

The Committee will review and, as necessary, make recommendations to the Board regarding the continued appropriateness of standing Board-approved capital expenditure guidelines

The Committee shall periodically review actual performance of capital expenditure projects against approved authorizations.

The Committee shall annually review the Company's insurance program, including the credit quality of its insurance carriers and reinsurers, the scope and limitations of coverage.

The Committee shall periodically review the performance and funding of the Company's retirement and pension programs.

The Committee shall periodically review reports from management with respect to the Company's tax status and strategy.

**Additional Committee Action**

The Committee shall pre-approve all auditing services and permitted non-audit services to be performed by the independent auditor. The Committee may form and delegate authority to subcommittees consisting of one or more members the authority to grant such pre-approvals. The Committee shall consider whether the provision of permitted non-audit services is compatible with maintaining the independent auditor's independence.

The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

The Committee shall discuss with management the Company's earnings press releases, including the use of any non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

The Committee shall meet to review and discuss the Company's quarterly financial statements, including reviewing the specific disclosures made in management's discussion and analysis, with management and the independent auditors.

The Committee shall review disclosures made by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10 Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

The Committee shall, as it determines necessary to carry out its duties, obtain advice and assistance from outside legal, accounting, or other advisors. The Company shall provide funding, as determined by the Committee, for such Committee actions and for compensation of any external auditor engaged by the Committee and for ordinary administrative expenses of the Committee.

## **DUTIES OF DEFENDANTS**

17.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Conagra, Defendants owed Conagra and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage Conagra in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of Conagra and its investors.

18.     Each director of the Company owes to Conagra and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19.     To discharge their duties, the officers and directors of Conagra were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Conagra were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Conagra conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(e)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

20.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in

the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Conagra, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## COMPANY OVERVIEW

21.    The Company is a branded consumer packaged goods food company that operates in many sectors of the food industry, with a focus on the sale of branded, private branded, and value-added consumer food, as well as foodservice items and ingredients.

22.    On May 4, 2018, prior to announcing the acquisition of Pinnacle Foods, Inc. ("Pinnacle") on June 27, 2018, the Company made an unsolicited non-binding proposal to acquire 100% of Pinnacle. Soon after the unsolicited non-binding proposal, on May 15, 2018, the Company signed a confidentiality agreement with Pinnacle. As part of the Company's due diligence process, on May 30, 2018, Pinnacle provided the Company access to Pinnacle's electronic data room.

## FALSE AND MISLEADING STATEMENTS

23.    On June 27, 2018, the Company issued a press release that announced the acquisition of Pinnacle in a cash and stock transaction, valued at approximately $10.9 billion. As part of the acquisition, Pinnacle shareholders were to receive $43.11 per share in cash and 0.6494 shares of Conagra. The implied consideration price was $68.00 per share.

24.    In the press release, the Company represented that the combination of Pinnacle and Conagra would have the following "Compelling Strategic and Financial Benefits":

- Complementary Portfolio of Iconic Brands:  The combined company will have a portfolio of leading, iconic brands within attractive domains such as frozen & refrigerated meals and snacks & sweet treats.

- <u>Enhanced Ability to Capitalize on Trends in Frozen Foods</u>: The combination will bring together complementary portfolios in the large, growing and on-trend frozen foods category, positioning the combined company to accelerate innovation and benefit from long-term tailwinds.

- <u>Compelling Growth Profile</u>: Conagra Brands and Pinnacle Foods are two of the fastest-growing companies in the consumer packaged foods industry by consumption, and Conagra Brands expects continued momentum based on the enhanced scale and new opportunities to partner with customers that the transaction will provide.

- <u>EPS Accretive</u>: On a percentage basis, Conagra Brands expects the transaction to be low single-digit accretive to adjusted EPS in the fiscal year ended May 2020 and high single-digit accretive to adjusted EPS in the fiscal year ended May 2022.

- <u>Significant Synergy Opportunities</u>: Conagra Brands expects to achieve approximately $215 million in annual run-rate cost synergies by the end of fiscal year 2022, with one-time cash costs to achieve the synergies estimated at approximately $355 million, inclusive of expected capital expenditures of approximately $150 million.

- <u>Financing Maintains Solid Investment Grade Credit Rating and Dividend Rate</u>: The transaction is expected to be financed by Conagra Brands equity issued to Pinnacle Foods shareholders, new transaction debt and incremental cash proceeds from a public equity offering and/or divestitures.

- <u>Proven Integration Capabilities</u>: In recent years, Conagra Brands has established a proven track record of executing strategic transactions. The two organizations share complementary portfolios, supply chains, and results-oriented cultures, which are expected to facilitate integration.

25.    The Company further represented in the press release the following:

The transaction will enhance Conagra Brands' multi-year transformation plan and expand its presence and capabilities in its most strategic categories, including frozen foods and snacks.  With annual net sales in excess of $3 billion, Pinnacle Foods' portfolio of frozen, refrigerated and shelf-stable products includes such well-known brands as Birds Eye, Duncan Hines, Earth Balance, EVOL, Erin's, Gardein, Glutino, Hawaiian Kettle Style Potato Chips, Hungry-Man, Log Cabin, Tim's Cascade Snacks, Udi's, Vlasic and Wish-Bone, among others. Based on both companies' latest fiscal year results, pro forma net sales would have been approximately $11 billion.

26.     In the press release, Defendant Connolly represented that the "addition of Pinnacle Foods' leading brands in the attractive frozen foods and snacks categories will create a tremendous opportunity for us to further leverage our proven innovation approach, brand building capabilities, and deep customer relationships.  With greater scale across leading, iconic brands, an unwavering focus on driving profitable growth, and a strong balance sheet and cash flow, we are creating a tremendous platform to drive meaningful shareholder value."

27.     During a conference call on June 27, 2018, Defendant Connolly represented that the Company was acquiring "a portfolio of complementary, leading brands" as "the Pinnacle team has done an absolutely phenomenal job driving innovation and growth here, and that meant a lot to us." Defendant Connolly also represented that "the cultures of Conagra and Pinnacle are highly complementary and that our organizations are a natural fit.  Much like Conagra, Pinnacle shares our focus on innovation and on maintaining a lean and efficient operating structure and close ties with customers."

28.     Defendant Connolly further represented that the Company had "a strong leadership team and proven capabilities driving brand building and innovation, we're confident in our ability to successfully integrate this acquisition and to build continued momentum and deliver meaningful shareholder value," and as the Company had a "proven track record of executing strategic transactions, we will be able to implement a smooth integration process."

29.     Discussing Duncan Hines, one of Pinnacle's leading brands, Defendant Connolly represented, "if you look at the fantastic innovation that's come out of the Pinnacle team on Duncan Hines in the last year or so, it's really demonstrating that Duncan Hines operates well as a sweet treat" and "we think there is real innovation opportunity still ahead there, and it fits squarely with what we do in sweet treats."

30.     On this same conference call, Ken Goldman, an analyst from JP Morgan asked:

"Hoping to get some color on why the synergies aren't a little bit higher than the typical 7%-ish rate in food. Just wondering why the supply chain synergies in frozen are not as high as maybe we expected. Is it that Pinnacle's SG&A is already very low and efficient, or maybe is there – I'm hoping, maybe there's just some conservatism in there?"

31.     In response, Defendant Connolly's represented: "So we've got 7% synergies here, which we are highly confident in, we've scrubbed every opportunity and we feel very good we can deliver this number […]. The numbers we've got in here we feel very good about. And, obviously, it's kind of like how we approach margins in general. We always look to overdeliver, but this is the number that we believe is correct. And it's about on par with what we've seen elsewhere in the industry."

32.     On September 4, 2018, at the Barclays Global Consumer Staples Conference, Defendant Connolly represented that Pinnacle's Birds Eye was "an absolutely terrific business. It's been a juggernaut, and it's incremental to what we do. And by the way, we think it opens up opportunities for us to apply some of our brands in that space . . . ." Defendant Connolly further represented the deal as "a no brainer":

> With respect to Pinnacle, ***this is as much of a no brainer of a deal as I think you're going to see.*** I don't know that you'll see any large deal that looks this much like a bolt-on as Pinnacle does. This is a company that is very similar in their core to what we do in our core, the more types of businesses and very similarly culturally. Lots of things we like about the portfolio, we like the margin structure on some of the grocery businesses. We like the growth prospects in frozen. But obviously, the thing we like most about it comes back to our unshakeable belief that frozen is a space that has call it 10 years or more of runway. And when you look at Pinnacle's portfolio versus our portfolio, what you see are terrific assets that are not redundant to what we do, they're additive and incremental to what we do.

33.     Barclays Analyst Andrew Lazar ("Lazar") also asked specifically about Pinnacle's fundamentals and the Company's due diligence in the acquisition: "I think there's some that think that, because Pinnacle 'settled' for a $68 price, which was below what I think many of the

investment community might have expected, that there must be something wrong with Pinnacle's fundamentals so that the outlook is somehow compromised. It did not seem that way as you just mentioned to us based on the second quarter results for Pinnacle, but again, love your thoughts on this more broadly, and then maybe pivoting into sort of *the due diligence done on the deal and what that told you and how you got comfortable with their internal projections*."

34.     In response, Defendant Connolly assured investors that the Company had done a thorough due diligence on Pinnacle and was completely "clear-eyed" when it came to the benefits of the Transaction.

> Yeah. I think the way to think about this is we've been looking at this for a while. And we know food businesses. We've been spending our whole career in the food industry. So, we've been very clear-eyed from the beginning as to what the synergy prospects were with this company and what we believed were the true perpetual growth rates that were tangible for this company going forward. And we use those assumptions to arrive at a valuation that we thought was fair and reasonable.

35.     In response to concerns about weakness of Pinnacle scanner data, Defendant Connolly represented: "I wouldn't worry too much around a lack of focus around deal dynamics because one of the things that you've seen with Pinnacle is this is a true performance-oriented team."

36.     On September 27, 2018, the Company reported financial results for the Company's first quarter fiscal year 2019. Later in the day, the Company conducted a conference call to discuss the financial results for the first quarter fiscal year 2019. During the conference call, Defendant Connolly represented that, based on the Company's "proven approach to innovation and brand building" it was "well positioned to accelerate the next wave of change with the addition of Pinnacle Foods" and "to enhance [Pinnacle's] portfolio of leading brands."

37.     The above statements were false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. The Company failed to disclose material information concerning its acquisition of Pinnacle, including that: (i) the Company

inadequately performed proper due diligence in connection with the acquisition of Pinnacle; (ii) the performance of Pinnacle's three leading brands was not deteriorating due to intensified competition, but rather due to self-inflicted subpar innovation and executional missteps; (iii) Pinnacle's business was performing so poorly that it had resorted to pushing promotional deals to retailers in an effort to boost sales; and (iv) as a result of the foregoing, the Company's public statements were materially false and/or misleading and/or lacked a reasonable basis when made.

38. On October 26, 2018, the Company announced the completion of the Pinnacle acquisition.

## THE TRUTH BEGINS TO EMERGE

39. On December 20, 2018, less than two months after the Pinnacle transaction was closed, the Company issued a press release announcing financial results for the second quarter of fiscal year 2019 that ended on November 25, 2018. The financial results included the impact of 31 days of Pinnacle ownership. For the 31 days after the closing, net sales for the Pinnacle segment totaled $259 million which "were below expectations due to weak performance across a range of significant brands." In addition, on a conference call during the day, Defendant Connolly further disclosed that there had been a "deterioration in the legacy Pinnacle business over the course of the calendar year 2018" as "growth stalled" for Pinnacle's three leading brands, Birds Eye, Duncan Hines, and Wish-Bone, and consequently, they "suffered sales and distribution losses." Defendant Connolly further admitted that these three leading brands accounted "for the vast majority of Pinnacle's current challenges" as "innovation was insufficient to sustain growth, primarily because it was subpar in its execution."

40. Moreover, Defendant Connolly revealed that "Pinnacle overextended new items in the same demand pools, favored high margins over high-quality and highly competitive products and

missed some major consumer trends," causing "missed steps [that] ultimately undermined brand strength and pricing power." Defendant Connolly concluded that "the challenges that the Pinnacle businesses face have been largely self-inflicted due to subpar innovation and executional missteps" and he did not "expect a material improvement in Pinnacle's underlying trends until the second half of Conagra's fiscal 2020."

41.    As a result, sales in the Pinnacle portfolio for calendar year 2018 would be "roughly $3 billion, which is about $160 million or 5% below Pinnacle's target."

42.    Defendant Connolly also admitted that the results for the Pinnacle segment were "highly disappointing" for the second half of 2018 because historically, "Pinnacle's gross margin performance was lower in the front half of the calendar year than the back half." For fiscal 2019, the Company estimated, for the seven-month period that Pinnacle would be combined with Conagra, the Pinnacle segment's "net sales will be down mid-single digits for our fiscal year 2019 versus the same period a year ago. This equates to $1.7 billion to $1.75 billion in Pinnacle's net sales for the 7-month period" because of "negative consumption trends in the Pinnacle business, along with an estimated $30 million of negative net sales impact from our post-decision to exit some low [return on investment year-end] price promotions."

43.    While Defendant Connolly described these promotional deals as "highly inefficient" in which Pinnacle was "chasing volume over value," an article in *The Wall Street Journal* commented: "That appears to be a nice way of saying they pushed excess inventory to retailers prior to the deal that was ultimately difficult to sell."

44.    Immediately, analysts doubted the Company's explanations for the shortfall in the Pinnacle segment and questioned whether Conagra performed proper due diligence prior to closing the Pinnacle transaction. Indeed, an analyst from JPMorgan asked on the conference call, "why

Pinnacle's performance worsened so suddenly" and whether "the due diligence could have been better" because "this feels like a really big surprise to most of us, something that maybe could have been a little bit avoided." In response to these comments, Defendant Connolly admitted that the Company failed to thoroughly review Pinnacle's businesses and brands during the due diligence process: "[T]here's only so much you can see in a public company diligence […]. Pinnacle is not a brand. It's a diverse company of brands. And so there were obviously businesses that were often businesses that were down, we were smack dab in the middle of diligence."

45.     Lazar from Barclays commented during the conference call that the situation "seems far more severe" since "it certainly sounded to [analysts] that you thought maybe initially that some of that Pinnacle margin opportunity could be delivered upon under Conagra's ownership." In response to Lazar's comments, Defendant Connolly admitted that because Conagra had "coveted this portfolio for a while," it had "concluded the acquisition would deliver high, single digit EPS accretion" when it was evaluating Pinnacle. However, due to the near year end weaknesses of the three leading Pinnacle brands, the EPS's "starting point is lower," but Conagra expects "to get right back to the same place at EPS by 2022." In other words, Conagra's "original EPS accretion guidance for this transaction" will not accrue until fiscal year 2022.

46.     Immediately following the conference call, analysts continued to question whether the Company performed proper due diligence in the Pinnacle transaction. Indeed, in an article published by *MarketWatch*, an analyst was quoted commenting that the call "suggested lax due diligence performed during the Pinnacle transaction, with improvement needed for Pinnacle's Birds Eye, Duncan Hines and Wish-Bone brands."

47.     Similarly, on December 20, 2018, JPMorgan published an analyst report where it concluded "that CAG management should have performed better due diligence on" Pinnacle.

JPMorgan noted that "the lack of visibility CAG recently had into [Pinnacle's] pending distribution losses is what (we think rightfully) irks many observers today." According to JPMorgan, Conagra must have "had industry sources (customers, *e.g.*) that could have set off warning flares months ago." Consequently, Conagra's failure to do proper due diligence was leaving "some investors spooked and unwilling to look at CAG for a while," and "the erosion of Pinnacle's business was so big (and happened so fast)" that sophisticated market participants pointedly stated that they "cannot recall a CEO so deeply criticizing the decisions made within a business acquired only two months prior."

48. On December 21, 2018, an analyst from RBC Capital Markets ("RBC") wrote in an analyst report that Conagra just disclosed "a litany of previously-unknown execution issues in the acquired Pinnacle business." Indeed, given that "many viewed Pinnacle as the vanguard of innovation and execution within US Food, we were surprised to hear that its franchise BirdsEye brand now faces high-single-digit distribution losses along with accelerating double-digit sales declines from the Duncan Hines and Wish-Bone brands."

49. As a result of the disclosures, the Company's stock fell $4.81, or 16.5%, on December 20, 2018, and declined an additional $2.13, or approximately 8.8%, on the next trading day. In fact, the Company's stock declined $8.13, or nearly 28%, in three trading sessions, to close at $20.96 on December 24, 2018.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

50. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

16

51.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

52.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

53.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Demand Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

54.     The Company Board is currently comprised of nine (9) members – Arora, Brown, Butler, Connolly, Gregor, Johri, Lenny, Marshall and Omtvedt.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

55.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

56.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

57. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

58. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## THE DEMAND DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Connolly

59. Defendant Connolly is not disinterested or independent, and therefore, is incapable of considering demand because Connolly (as President of the Company) is an employee of the Company who derives substantially all of his income from his employment with Conagra, making him not independent. As such, Connolly cannot independently consider any demand to sue himself for breaching his fiduciary duties to Conagra, because that would expose him to liability and threaten his livelihood.

60. This lack of independence and financial benefits received by Connolly renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

61. In addition, Connolly is a defendant in the securities class actions entitled (1) *Estrada v. Conagra Brands, Inc., et al.*, Case: 1:19-cv-01805 (N.D. Ill.); (2) *Houston Municipal Employees Pension System v. Conagra Brands, Inc., et al.*, Case: 1:19-cv-02550 (N.D. Ill.); and (3) *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc., et al.*, Case: 1:19-cv-01323 (N.D. Ill.).

62.    As such, Defendant Connolly cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendants Arora, Brown, Butler, Gregor, Johri, Lenny, Marshall and Omtvedt**

63.    Defendants Arora, Brown, Butler, Gregor, Johri, Lenny, Marshall and Omtvedt are defendants in the securities class actions entitled (1) *Houston Municipal Employees Pension System v. Conagra Brands, Inc., et al.*, Case: 1:19-cv-02550 (N.D. Ill.) and (2) *West Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc., et al.*, Case: 1:19-cv-01323 (N.D. Ill.).

64.    As such, Defendants Arora, Brown, Butler, Gregor, Johri, Lenny, Marshall and Omtvedt cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, because that would expose them to liability and threaten his livelihood.

**Audit Committee Defendants**

65.    Defendants Arora, Brown, Butler, Gregor and Omtvedt served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the purposes of the Committee are to assist the Board in fulfilling its oversight responsibilities related to: (i) the integrity of the Company's financial statements; (ii) the Company's internal accounting and financial reporting controls; (iii) the Company's compliance with legal and regulatory requirements; (iv) the Company's risk assessment and risk management regarding financial reporting and legal compliance; (v) the registered public accounting firm's qualifications and independence; and (vi) the performance of the registered public accounting firm.

66.    Defendants Arora, Brown, Butler, Gregor and Omtvedt breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and

19

other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein. Thus, Defendants Arora, Brown, Butler, Gregor and Omtvedt face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## **FIRST CAUSE OF ACTION**

### **Against the Director Defendants for Breach of Fiduciary Duties**

67.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

68.     Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

69.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

70.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials and internal controls. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

71.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

72.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.

Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

73. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

74. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

75. As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

76. As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

77. Plaintiff, on behalf of the Company, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Director Defendants for Gross Mismanagement

78. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

79. By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

80. As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

81. Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### Against the Director Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5

82. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83. During the relevant period, Defendants disseminated or approved public statements that failed to disclose the truth about the Company's business and corporate affairs as set forth above, and thus Revolution Lighting's public statements were materially false and/or misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

84. As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

     (a)    employed devices, schemes, and artifices to defraud; and

     (b)    made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.     As a result of Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable

Dated: May 9, 2019                  Respectfully Submitted:

                                    **CAFFERTY CLOBES MERIWETHER &
                                    SPRENGEL LLP**

                                    By: */s/ Daniel O. Herrera*_____

                                    Daniel O. Herrera
                                    150 South Wacker Drive, Suite 3000
                                    Chicago, IL 60606
                                    Tel: (312) 782-4880
                                    Fax: (312) 782-4485
                                    Email: dherrera@caffertyclobes.com

                                    Thomas J. McKenna
                                    Gregory M. Egleston
                                    **GAINEY McKENNA & EGESTON**
                                    440 Park Avenue South, 5th Floor
                                    New York, New York 10016
                                    Telephone: (212) 983-1300
                                    Facsimile: (212) 983-0383
                                    Email: tjmckenna@gme-law.com
                                    Email: gegleston@gme-aw.com

                                    *Counsel for Plaintiff*